**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:25-CV-00180-CHL**

**DAVID N.,**[1] **Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**[2] **Defendant.**

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Complaint filed by Plaintiff, David N. ("Claimant"). Claimant seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"). (DN 1.) Claimant and the Commissioner each filed a Fact and Law Summary and/or supporting brief. (DNs 12, 13, 15.) Claimant did not file a reply, and his time to do so has expired. (DN 11.) The Parties have consented to the jurisdiction of a Magistrate Judge to enter judgment in this case with direct review by the Sixth Circuit Court of Appeals in the event an appeal is filed. (DN 10.) Therefore, this matter is ripe for review.

For the reasons set forth below, the final decision of the Commissioner is **REVERSED**, and this matter is **REMANDED**, pursuant to sentence four of 42 § U.S.C. 405(g), to the Commissioner to conduct additional proceedings to remedy the herein identified defects in the original proceedings.

## I. BACKGROUND

On September 6, 2022, Claimant applied for disability insurance benefits under Title II ("DIB"). (R. at 11, 188-89, 196-97, 318-24.) His application alleged disability beginning on July

[1] Pursuant to General Order 23-02, the Plaintiff in this case is identified and referenced solely by first name and last initial.
[2] As Frank Bisignano is now the Commissioner of Social Security, he is automatically substituted as the Defendant in this matter pursuant to Fed. R. Civ. P. 25(d). The Clerk is directed to change the case caption to reflect the substitution.

1, 2022, due to shoulder impairment (previous replacement), knee impairments (previous replacement in both knees), muscle impairment (previous 8lb mass removed), osteoarthritis, mobility issues in arms (reaching), pain throughout body, mobility issues in walking and standing long periods, anxiety, depression, hypertension, hernia, back surgery, and a head wound due to a fall. (*Id.* at 11, 188-89, 196-97, 343.) Claimant's applications were denied initially and again on reconsideration. (*Id.* at 220-24, 232-35.)

At Claimant's request, Administrative Law Judge ("ALJ") Norman Hemming ("the ALJ") conducted a hearing on Claimant's application on November 29, 2023. (*Id.* at 160-87, 240-42.) Claimant attended the hearing by telephone with his non-attorney representative. (*Id.* at 162-63.) An impartial vocational expert also participated in the hearing. (*Id.*) During the hearing, Claimant testified to the following. He is left-handed. (*Id.* at 169.) Before his first shoulder surgery, he "couldn't hardly lift anything," and he still can't reach above his head even after two surgeries. (*Id.* at 169, 177.) He is still healing from his second surgery. (*Id.* at 169-70.) He has pain when moving his arm, and his pain is still a level six or seven out of ten even when he takes his medicine. (*Id.* at 170.) He can pick up a gallon of milk but he can't hold on to it with his left hand and arm. (*Id.* at 171.) He uses a heating pad every night for his pain, and it helps for the first ten to fifteen minutes. (*Id.* at 176.) He is also limited in his ability to reach sideways with his left arm. (*Id.* at 177.) The fingers go numb in his left hand. (*Id.*) He had knee surgery, and his knees still bother him if he is standing for twenty minutes. (*Id.* at 170, 178.) He estimated he could walk for half a block before he has to stop. (*Id.* at 182.) He would have to sit down after twenty minutes of standing due to pain in his knees. (*Id.* at 178.) He estimated he could sit for approximately twenty to thirty minutes before he had to change positions. (*Id.* at 182.) He also has vision issues and is legally blind in his left eye. (*Id.* at 174.) He has anxiety and depression. (*Id.* at 171.) He is not a

people person, but he can talk to people. (*Id.* at 178.) Regarding his daily activities, he testified that he gets his five-year-old grandson ready for school, puts his grandson on the bus, watches TV, then sits with his grandson while his grandson plays after his grandson comes home from school. (*Id.* at 171-73.) He attends church twice per month and goes to his grandson's sports games. (*Id.* at 173-74.) He can take a shower but has to use his right arm. (*Id.* at 176.) He can drive to the store but his arm hurts when he does; usually, his wife drives. (*Id.* at 174.)

The ALJ issued an unfavorable decision on January 3, 2024. (*Id.* at 8-30.) Applying the five-step sequential evaluation process promulgated by the Commissioner to determine whether an individual is disabled, the ALJ made the following findings. First, the Claimant had not engaged in substantial gainful activity since July 1, 2022, his alleged onset date. (*Id.* at 13.) Second, Claimant had severe impairments including osteoarthritis and allied disorders and obesity. (*Id.*) Third, Claimant did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.* at 15.) Fourth, Claimant had the residual functional capacity ("RFC") to perform light work with the following exceptions:

> the claimant can occasionally climb ladders, ropes or scaffolds and can frequently climb ramps and stairs. He can frequently stoop, kneel, and crouch. He can occasionally crawl. He is unlimited as to balancing. He is unlimited as to reaching in all directions except he can occasionally reach overhead with the left arm and hand. He is unlimited as to handling, fingering, and feeling. He can have frequent exposure to vibration, hazards, and pulmonary irritants. He can never have near and far acuity or accommodation with the left eye. He can concentrate for 2-hour segments at a time.

(*Id.* at 15.) Additionally at step four, the ALJ found that Claimant was unable to perform any of his past work as a house painter. (*Id.* at 23.) Fifth, and finally, considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the

national economy that Claimant could perform. (*Id.* at 24.) The ALJ concluded that Claimant was not under a disability from July 1, 2022, through the date of his decision. (*Id.* at 25.)

Claimant subsequently requested an appeal to the Appeals Council, which denied his request for review on January 27, 2025. (*Id.* at 1-7, 315-17, 417-19.) At that point, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 422.210(a) (2025); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision). Pursuant to 20 C.F.R. § 422.210(c), Claimant is presumed to have received that decision five days later. 20 C.F.R. § 422.210(c). Accordingly, Claimant timely filed this action on March 31, 2025. (DN 1.)

## II. DISCUSSION

The Social Security Act authorizes payments of DIB to persons with disabilities. *See* 42 U.S.C. §§ 401-434. An individual shall be considered "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a) (2025).

### A. Standard of Review

The Court may review the final decision of the Commissioner but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have

supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Hum. Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that if the court determines the ALJ's decision is supported by substantial evidence, the court "may not even inquire whether the record could support a decision the other way"). However, "failure to follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

**B. Five-Step Sequential Evaluation Process for Evaluating Disability**

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating whether an individual is disabled. 20 C.F.R. § 404.1520 (2025). In summary, the evaluation process proceeds as follows:

(1) Is the claimant involved in substantial gainful activity? If the answer is "yes," the claimant is not disabled. If the answer is "no," proceed to the next step.

(2) Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[3] and significantly limits his or her physical or mental ability to do basic work activities? If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

(3) Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

(4) Does the claimant have the RFC to return to his or her past relevant work? If the answer is "yes," then the claimant is not disabled. If the answer is "no," proceed to the next step.

(5) Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work? If the answer is "yes," the claimant is not disabled. If the answer is "no," the claimant is disabled.

[3] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509 (2025).

20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof with respect to steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). However, the burden shifts to the Commissioner at step five to prove that other work is available that the claimant is capable of performing. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). The claimant always retains the burden of proving lack of RFC. *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

**C. Claimant's Contentions**

Claimant alleged that the ALJ erred in three ways in determining his RFC. First, Claimant argued that the ALJ's analysis of the opinion evidence from consultative examiners Sarah Grattan, M.Ed., and Michael E. Whitten, Ph.D., did not comport with the requirements of 20 C.F.R. § 404.1520c. (DN 12, at PageID # 1828-31, 1833; DN 13, at PageID # 1842-43.) Second, he argued that the ALJ erred in his analysis of the opinions of the state agency medical consultants, Robert Culbertson, M.D., ("Dr. Culbertson") and Douglas Back, M.D., M.B.A., ("Dr. Back"). (DN 12, at PageID # 1828-29, 1831-33; DN 13, at PageID # 1843-44.) Finally, Claimant argued that the ALJ erred in his evaluation of Claimant's subjective testimony. (DN 12, at PageID # 1833-38; DN 13, at PageID # 1844-45.) The Court finds Claimant's second and third arguments persuasive and will reverse and remand this matter on the basis of those arguments; thus, the Court does not reach Claimant's first argument herein.

Claimant's second and third arguments relate to the ALJ's consideration of his left shoulder impairment. Claimant first complained to his primary care provider of left shoulder pain during a November 2, 2021, appointment, reporting that the pain had been present for several months, it was worse with movement, and the area was tender to the touch. (R. at 455, 611.) His primary

care provider documented decreased range of motion, tenderness, and pain and referred Claimant to orthopedics for evaluation. (*Id.* at 458, 614.) At his initial orthopedics evaluation on November 8, 2021, Julia Kay Prohaska, PA, ("PA Prohaska") documented that Claimant had several years of discomfort in his left shoulder that had been gradually getting worse over the past three months accompanied by a "significant decrease in his overall mobility." (*Id.* at 639.) PA Prohaska documented abnormal range of motion and did an x-ray that showed arthritic changes and calcification around the supraspinatus. (*Id.* at 641.) Claimant underwent a cortisone injection, was told to take diclofenac as prescribed, and was given a home exercise program. (*Id.* at 641-42.) Claimant returned to PA Prohaska's office sooner than scheduled because the cortisone injection did not alleviate any of his discomfort, and he continued to experience decreased range of motion and pain. (*Id.* at 667.) PA Prohaska again documented decreased range of motion and pain with use despite conservative treatment with a home exercise program and a cortisone injection. (*Id.* at 667-68.) She ordered an MRI. (*Id.* at 668.) The MRI revealed a small articular surface partial tear of Claimant's anterior supraspinatus, low-grade intrasubstance tearing of the conjoined fibers of the supraspinatus and infraspinatus, moderately severe glenohumeral osteoarthritis, and marked acromioclavicular osteoarthritis. (*Id.* at 670.) PA Prohaska noted that the MRI showed a small rotator cuff tear, as well as severe cartilaginous loss of the glenohumeral joint, and that Claimant had pain despite use of anti-inflammatory medications, a home exercise program, and a cortisone injection. (*Id.* at 685.) She referred Claimant to Dr. Kevin L. Harreld, M.D., ("Dr. Harreld") for evaluation and to discuss both surgical and nonsurgical options for further treatment. (*Id.* at 686.)

Claimant saw Dr. Harreld on December 20, 2021. (*Id.* at 691-707.) Dr. Harreld observed that Claimant had left glenohumeral joint osteoarthritis that failed a corticosteroid injection and

was reporting daily pain, difficulty getting his arm overhead, and pain radiating down his lateral deltoid. (*Id.* at 697.) Dr. Harreld reviewed the MRI and stated that it showed "extensive degenerative labral tearing and rotator cuff tendinosis and possible partial articular tear to [a] lesser extent." (*Id.* at 701.) Dr. Harreld opined that Claimant would require surgery at some point but noted that Claimant's weight prevented him from being a surgical candidate at the time. (*Id.* at 703.) Dr. Harreld recommended that Claimant undergo an image-guided cortisone injection, finding that it was likely that last injection was not intra-articular. (*Id.*) Claimant underwent that injection on December 28, 2021. (*Id.* at 724-28, 1559-66.) When Claimant saw Dr. Harreld again on January 31, 2022, he reported that the injection provided only limited relief before his symptoms returned. (*Id.* at 780.) He advised Dr. Harreld that he knew he needed shoulder surgery and was working on losing weight so he could have it. (*Id.*) Dr. Harreld documented tenderness over Claimant's AC joint and abnormal range of motion; he did not recommend further injections given the previous ones failed to alleviate Claimant's pain. (*Id.* at 780-81.) He advised Claimant to continue losing weight and follow up with him after Claimant's appointment with another provider that Claimant was seeing to discuss weight loss interventions. (*Id.* at 781.) When Claimant next saw Dr. Harreld on July 5, 2022, Claimant had had bariatric surgery and his weight was down enough to make him a candidate for shoulder surgery. (*Id.* at 936.) Dr. Harreld performed x-rays that again showed left glenohumeral joint arthritis. (*Id.* at 941.) Claimant elected to proceed with surgery, and Dr. Harreld ordered a CT scan of Claimant's left shoulder. (*Id.* at 940-41.) The CT showed glenohumeral osteoarthritis and acromioclavicular osteoarthritis and loose bodies in the subcoracoid bursa as well as adjacent to the greater tuberosity. (*Id.* at 966.)

Claimant underwent a left anatomic total shoulder arthroplasty on July 13, 2022, with Dr. Harreld. (*Id.* at 997-1015.) Two weeks post-op, Claimant was non-weightbearing in a sling, and

an x-ray performed showed a "stable left stemless total shoulder arthroplasty." (*Id.* at 1022.) Claimant was instructed to remain non-weightbearing, complete prescribed exercises and follow up in four weeks. (*Id.*) When he saw Dr. Herrald six weeks post-surgery, Dr, Harreld noted Claimant was doing well, advised Claimant to discontinue the sling, restricted Claimant to lifting one-to-two pounds, and instructed Claimant to complete physical therapy. (*Id.* at 1094.) His physical therapy initial evaluation noted that Claimant had shoulder pain and impaired shoulder and scapular mobility, strength, and range of motion. (*Id.* at 1099-1101, 1100.) Claimant did approximately six physical therapy sessions over the course of a month and reported that while his movement was better, his shoulder still felt tight. (*Id.* at 1102, 1104.) The physical therapist noted that while Claimant had met his short-term range of motion goals, Claimant still had significant cuff and scapula weakness limiting his range of motion and that Claimant still couldn't lift or reach due to his post-op status and weakness. (*Id.* at 1104.) At his next visit with Dr. Harreld, Dr. Harreld again noted that Claimant's arthroplasty appeared stable on x-ray; Dr. Harreld instructed Claimant to work on a strengthening program in PT and follow up in twelve weeks. (*Id.* at 1135.) When Claimant saw his primary care provider in November 2022, four months after his shoulder surgery, Claimant reported that he still could not fully raise his arm over his head. (*Id.* at 1328.)

Dr. Culbertson reviewed Claimant's medical records and opined as to his RFC on November 28, 2022. (*Id.* at 192-94.) He found that Claimant could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds and was unlimited in his ability to push or pull with his upper extremities. (*Id.* at 192.) He found that Claimant could perform limited left overhead reaching and unlimited front and lateral reaching. (*Id.* at 193.) In the additional explanation section on the form, Dr. Culbertson noted that Claimant had had left shoulder surgery, cited notes that indicated Claimant was doing well post-op, and stated, "Claimant's allegations of

physical limitations are partially consistent. The claimant is expected to have ongoing improvement of L shoulder impairments 12 months after the alleged onset." (*Id.* at 193-94.)

Claimant saw Dr. Harreld in January 2023, who documented that Claimant's pain and range of motion were improving even though Claimant reported feeling like he was struggling with abduction and his shoulder catching. (*Id.* at 1497.) Dr. Harreld performed another x-ray, which showed questionable positioning of the subscapularis osteotomy though no fracture or acute abnormality. (*Id.* at 1499-1500.) Dr. Harreld ordered Claimant to complete more physical therapy to address his rotator cuff weakness and follow up in three months. (*Id.* at 1500.) When Claimant saw his primary care provider on February 2, 2023, he reported that he still could not raise his left arm fully over his head. (*Id.* at 1515.)

Claimant underwent a consultative examination with Kamal Nigam, M.D., ("Dr. Nigam") on May 3, 2023. (*Id.* at 1628-35.) Dr. Nigam noted that Claimant had had left shoulder surgery but still reported marked limitations using his left shoulder such that Claimant may require more time to heal. (*Id.* at 1629.) He observed that Claimant could not move his left arm more than ninety degrees of abduction and had decreased grip strength in his left hand. (*Id.* at 1630.) Dr. Nigam opined that Claimant would have "limitations lifting objects and carrying objects because of left shoulder problems, limited abduction." (*Id.*) He explained, "The patient has ongoing problem with left shoulder. He will require follow[ ]up with orthopedics to determine his ability to use his shoulder." (*Id.* at 1631.)

Dr. Back evaluated Claimant's RFC at the reconsideration level on May 16, 2023. (*Id.* at 203-05.) He echoed Dr. Culbertson's prior findings, noting that Claimant had "state[d] no new changes" and that Dr. Nigam's assessment "did not alter assessment. The initial assessment is more persuasive and the initial assessment is affirmed." (*Id.* at 205.)

Claimant saw Dr. Harreld on July 21, 2023, a little over one year after his first surgery. (*Id.* at 1767-84.) Dr. Harreld noted that Claimant reported experiencing progressive pain over the last month that had been worsening and that the office "ha[d] been following radiographic abnormality over the lesser tuberosity concerning for suprascapularis rupture." (*Id.* at 1769.) Claimant reported a gradual onset of increasing pain and diminishing range of motion but no trauma; he had even recently gone to the ER for his pain. (*Id.*) He was having trouble moving his arm above shoulder-level. (*Id.*) Dr. Harreld noted decreased range of motion and that scans done during Claimant's emergency room visit showed a complete displacement of the lesser tuberosity osteotomy consistent with progressive displacement of the osteotomy on radiographs over the past year. (*Id.* at 1773-74.) Dr. Harreld advised Claimant that a reverse shoulder arthroplasty was the most reasonable outcome and that Claimant could experience some degree of glenoid bone loss and scarring of the surgical planes pending time and complexity of the procedure. (*Id.* at 1774.)

Claimant underwent reverse left shoulder arthroplasty on August 16, 2023. (*Id.* at 1757-59.) Two weeks postop, he was still nonweightbearing in the sling, working on home exercises, and working on weaning down his pain medication. (*Id.* at 1744.) X-rays taken during the visit showed a stable left revision reverse shoulder arthroplasty. (*Id.*) Six weeks postop, Dr. Harreld noted that the x-rays showed well positioned components with no evidence of loosening. (*Id.* at 1728.) He documented that Claimant was doing well, had minimal pain save for upper trapezius spasms, should do a home exercise program to improve his range of motion, and should follow up in eight weeks. (*Id.*) This last visit with Dr. Harreld in the record is dated September 26, 2023. (*Id.* at 1725-35.) Claimant had his hearing with the ALJ approximately two months later, on November 29, 2023. (*Id.* at 160-87.) During that hearing, he reported being unable to reach above

his head, still having pain every time he moves his arm, and being limited in his ability to pick up and carry things with his left arm and hand. (*Id.* at 169-71.)

Despite this evidence, in his decision, the ALJ found that Claimant had the RFC to perform light work (defined by regulation as involving lifting and carrying up to twenty pounds at a time and ten pounds frequently) except that he could only occasionally perform overhead reaching with his left arm and hand. (*Id.* at 15.) In his RFC analysis, the ALJ summarized in large part the same medical evidence set forth herein except his discussion began only in January 2022. (*Id.* at 17.) He also evaluated the opinion evidence of record. After summarizing Drs. Culbertson and Back's opinion, he stated, "I find the opinions of the DDS at Ex. 2A and 4A are persuasive and consistent by the evidence of record; however, I have added additional limitations based on the records that were submitted at hearing level." (*Id.* at 23.) As to Dr. Nigam, he noted that Dr. Nigam found limitations related to his left shoulder, but he wrote, "[T]hese limitations are not assessed in vocational terms, but I find that the clinical observations and findings are persuasive and have been accounted for when formulating the RFC herein." (*Id.*) The Court finds the ALJ's conclusory and cursory opinion evidence discussion insufficient to comport with the regulatory requirements.

Pursuant to 20 C.F.R. § 404.1520c, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the record regardless of its source.[4] 20 C.F.R. § 404.1520c(a) (2025). Instead, an ALJ will evaluate the "persuasiveness" of a medical opinion by reference to the five factors listed in the regulation: supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 404.1520c(a), (c). The regulations provide that the two most important factors are supportability and consistency and that an ALJ is required to "explain how [he or she] considered the

[4] This language indicates that the new regulation has done away with the controlling weight and other old rules regarding the weight to be ascribed to medical opinions. 20 C.F.R. § 404.1527(c)(2) (2025).

supportability and consistency factors for a medical source's medical opinions." 20 C.F.R. § 404.1520c(a), (b)(2). However, the regulations state that "it is not administratively feasible for [an ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions . . . in [the] case record"; thus, an ALJ is not required to explicitly discuss how he or she weighed the factors of relationship with the claimant,[5] specialization, and other factors.[6] 20 C.F.R. § 404.1520c(b)(1)-(2). Where two medical opinions reach different conclusions but are "equally well-supported . . . and consistent with the record," an ALJ is required to state how he or she considered the other "most persuasive" factors in making his or her decision. 20 C.F.R. § 404.1520c(b)(3).

The Sixth Circuit has not elucidated a specific standard aside from the text of the regulation to determine whether an ALJ sufficiently complied with the requirement to "articulate how [he or she] considered the medical opinions" and "explain how [he or she] considered the supportability and consistency factors" under the new regulations. 20 C.F.R. § 404.1520c(b). *But see Gregory v. Comm'r of Soc. Sec.,* No. 26-5022, 2026 WL 1763752, at *2 (6th Cir. June 18, 2026) (quoting in part 20 C.F.R § 404.1520c(b)(2)) ("To pass muster, the ALJ need only explain 'how [he] considered the supportability and consistency factors for a medical source's medical opinions.' "); *Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *2 (6th Cir. Sept. 28, 2023) (noting that the new regulations "substantially reduce[] the ALJ's obligation to explain the basis for his or her assessment of medical opinions"); *Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813,

[5] In assessing this factor, the regulations require an ALJ to consider the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship. 20 C.F.R. § 404.1520c(c)(3).

[6] The regulations provide that an ALJ will consider any "other factors that tend to support or contradict a medical opinion." 20 C.F.R. § 404.1520c(c)(5). These factors include, but are not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim," "whether new evidence [] receive[d] after the medical source made his or her medical opinion . . . makes the medical opinion . . . more or less persuasive," and whether the medical source has "an understanding of [the] disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(5).

822 (6th Cir. 2020) (White, J. dissenting) (applying the new regulations and finding that "[t]he ALJ did not clearly analyze the supportability and consistency of the state consultants' assessments, as compared to other evidence in the record which supported [the plaintiff]'s claims"). However, district courts applying the new regulations within this circuit consistently apply the articulation requirement literally. *See, e.g.*, *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 909 (E.D. Mich. 2021) ("The administrative adjudicator has the obligation in the first instance to show his or her work, i.e., to explain in detail *how the factors actually were applied* in each case, to each medical source. Resorting to boilerplate language to support a finding of unpersuasiveness does not satisfy that obligation." (emphasis in original)); *White v. Comm'r of Soc. Sec.*, No. 1:20-CV-00588-JDG, 2021 WL 858662, at *21 (N.D. Ohio Mar. 8, 2021) ("Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of [her] reasoning."); *Lester v. Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, No. 5:20-CV-1364, 2021 WL 119287, at *1 (N.D. Ohio Jan. 13, 2021) (finding that "the [new] regulations do require that the ALJ clearly explain his consideration of the opinions and identify the evidence supporting his conclusions").

The ALJ's analysis does not comport with these requirements. His discussion does not even address both regulatory requirements and nothing about the remainder of his analysis cures the deficiency. In particular, he essentially adopted the opinions of Drs. Back and Culbertson despite the fact that neither of those reviewers knew that Claimant needed a second shoulder surgery and were assuming he would fully recover from his first. The latter undisputedly never occurred. The ALJ's discussion wholly fails to explain why this subsequent medical history does

not undermine the persuasiveness of the opinions of Drs. Back and Culbertson. The ALJ purported to explain that he updated Drs. Back and Culbertson's limitations to reflect changes in the medical record, but the only pertinent change between their opinions was that the ALJ found Claimant could perform "occasional" overhead reaching with his left arm and Drs. Back and Culbertson opined he could performed "limited" overhead reaching with his left arm. (*Compare* R. at 15, *with id.* at 192-94, 203-05.) It is entirely unclear to the Court that those two definitions are even any change at all, let alone one that is reflective of new "records that were submitted at hearing level," given that ALJs do not define RFCs in terms of "limited," they define things in terms of occasionally and frequently. *See* SSR 83-10, 1983 WL 31251, at *5-6 (Jan. 1. 1983) (defining occasionally to mean "occurring from very little up to one-third of the time" and frequently to mean "occurring from one-third to two-thirds of the time"). And while Claimant did not challenge the ALJ's discussion of Dr. Nigam's opinion, the Court cannot help but observe it is similarly deficient in terms of a substantive discussion of the regulatory factors. While the ALJ is not required to base his RFC determination on a medical opinion, here the ALJ's discussion does not sufficiently account for the relationship between Claimant's second shoulder surgery and the RFC he crafted on the basis of the opinions of two physicians who knew only about the first surgery and one who believed further development regarding Claimant's orthopedic condition was needed. The Court finds this insufficient to comply with either 20 C.F.R. 404.1520c or the substantial evidence standard on the facts of this case.

This error is compounded by the ALJ's complete lack of discussion of Claimant's subjective allegations. Claimant challenged the ALJ's analysis of his subjective symptoms as unsupported by substantial evidence. (DN 12, at PageID # 1833-38; DN 13, at PageID # 1844-45.) The ALJ's entire discussion on the matter was as follows:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because based on a review of the medical evidence of record, as well as the claimant's testimony at the hearing, I find the evidence contained in the record does not support the claimant's allegations of incapacitating symptoms that would prevent the claimant from working.

(R. at 22.) 20 C.F.R. § 404.1529 provides that when forming an RFC, an ALJ must assess the claimant's subjective allegations regarding his or her symptoms. 20 C.F.R. § 404.1529(a) (2025); SSR 16-3p, 81 Fed. Reg. 14166 (March 16, 2016); SSR 16-3p, 82 Fed. Reg. 49462 (Oct. 25, 2017) (revising SSR 16-3p as initially published to its current operative form). A claimant's statement that he or she is experiencing pain or other symptoms will not, taken alone, establish that he or she is disabled; there must be objective medical evidence that shows the existence of a medical impairment that could reasonably be expected to give rise to the pain and/or other symptoms alleged. 20 C.F.R. § 404.1529(a). If the ALJ finds that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must then assess the intensity and persistence of a claimant's symptoms to determine how those symptoms limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). In doing so, the ALJ should consider a number of factors including a claimant's daily activities; the location, duration, frequency, and intensity of a claimant's pain or other symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness, and side effects of claimant's medications; and any other measures a claimant may use to alleviate pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929). The regulations only require an ALJ to *consider* the pertinent factors; they do not require the ALJ to discuss all the factors in his or her opinion. *See Dutkiewicz v. Comm'r of Soc. Sec.,* 663 F. App'x 430, 433 (6th Cir. 2016) ("The ALJ was not required to explicitly discuss [claimant]'s work history when assessing his credibility . . . ."). However, the ALJ's

decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 82 Fed. Reg. at 49467. The ALJ's decision contains no such discussion. While the ALJ did recount Claimant's hearing testimony, nothing about the ALJ's summary allows the Court to trace the path of his reasoning or otherwise understand why the ALJ rejected Claimant's consistent subjective allegations regarding his shoulder limitations and his pain.

In sum, the ALJ found that a left-handed former house painter of thirty years who had two surgeries on his left shoulder within a year of each other, with the most recent being in the months before the ALJ's hearing in this matter, could perform light work including occasional overhead reaching with his left arm and hand. The ALJ supported his analysis with an insufficient discussion of the outdated opinion evidence and without any of the required analysis of the Claimant's subjection allegation that he still could not lift his arm above his head or lift and carry items with his left hand and arm after his second surgery. The medical evidence surveyed above provides a specific narrative of decline between surgeries and little about Claimant's likely condition after his second surgery except Claimant's subjective allegations, which the ALJ did not address. For these reasons, the Court finds that ALJ's discussion insufficient to comport with the relevant regulatory requirements discussed herein or the substantial evidence standard.

## III. CONCLUSION AND ORDER

For the reasons set forth above, IT IS HEREBY ORDERED that the final decision of the Commissioner is **REVERSED** and that this matter is **REMANDED**, pursuant to sentence four of 42 § U.S.C. 405(g), to the Commissioner to conduct additional proceedings to remedy the above-identified defects in the original proceedings. A final judgment will be entered separately.

Colin H Lindsay, Magistrate Judge
United States District Court

cc: Counsel of Record

September 15, 2026